**E-FILED**
Wednesday, 10 April, 2013  11:30:15 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROGETTE DENT on behalf of K.V. a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3106 |
| | ) | |
| CAROLYN COLVIN, Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Rogette Dent brings this action on behalf of her minor daughter K.V. to appeal the denial of Supplemental Security Income benefits (Disability Benefits) to K.V. under title XVI of the Social Security Act.  42 U.S.C. §§ 1381a, and 1382c.  Dent has filed Brief in Support of Motion for Summary Judgment (d/e 8) (Dent Motion), and Defendant Acting Commissioner of Social Security (Commissioner) has filed a Motion for Summary Affirmance (d/e12).[1]  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  Consent to Proceed Before a  United States Magistrate and Order of Reference, entered

---

[1] The Court takes judicial notice that Carolyn Colvin is now Acting Commissioner of Social Security.  Colvin is, therefore, automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

November 14, 2012 (d/e 10).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

K.V. was born January 9, 2003.  Her application for Disability Benefits was filed on June 15, 2009.  Her alleged onset date was May 1, 2008.  K.V. suffers from speech and language delays, a learning disorder, attention deficit hyperactivity disorder, rare syncopal episodes, and episodic enuresis.  Answer to Complaint (d/e 6), attached, Certified Transcript of Proceedings before the Social Security Administration (R.), at 41, 44.

K.V. attended the Quincy, Illinois, Public School District's Early Childhood Education Program from August 2006 until November 2006, and again in the 2007-2008 school year.  In March 2008, K.V. was identified as eligible for special education services for speech/language impairment. R. 498.

On November 25, 2008, K.V. saw her primary care pediatrician, Dr. Laura Baustain, D.O., because of a rash and wetting the bed at night. Dent, her mother, also reported K.V. had begun to wet the bed and have accidents at school.  R. 301.  Dr. Baustain recommended limiting fluids after 6:00 p.m. and waking K.V. before Dent went to bed to allow K.V. to

use the bathroom.  Dr. Baustain noted that she would prescribe desmopressin acetate nasal spray (DDAVP) if the problems persisted. R. 301. [2]

On December 12, 2008, K.V. saw Dr. Baustain because of concerns about K.V.'s performance in school.  Dent reported that K.V. was having difficulty in school.  R. 299-300.  She reported that K.V. was being moved to learning disabled classes next semester.  She reported that K.V. was mean and aggressive.  She reported that K.V. would be playing with her sister and "just bite her really hard."  R. 299.  On examination, Dr. Baustain found K.V. to be "Outgoing, although not really interactive with any one person in the room. . . .  Not easily brought to attention for interactions with myself."  R. 299.  Dr. Baustain assessed a learning defect and possible learning disability, developmental delay or mental retardation.  She recommended an assessment by the school and a developmental pediatrician.  R. 299.

On April 22 and 29, 2009, K.V. underwent a psychological evaluation by the Special Education Association of Adams County, Illinois.  R. 498-502.  Test results conducted during the evaluation put K.V.'s overall ability in the low average range, with verbal comprehension and visual processing

---

[2] The record elsewhere indicates that desmopressin acetate nasal spray is also referred to as DDAVP. See R. 425-27.

speed in the average range, and perceptual reasoning in the low average range.  R. 499.  Academic achievement testing showed K.V. to be in the low average range for spoken language, writing, and general information; and in the significantly below average range for reading and math.  R. 500.  Based on this evaluation, K.V. continued to receive special education services at school.

On June 3, 2009, K.V. saw Dr. Charles Morton, M.D., for evaluation.  R. 270-74.  Dent reported to Dr. Morton that K.V.'s preschool speech teacher did a wonderful job with her, but she still had speech problems.  Dent reported that K.V. had good gross motor skills and fairly good fine motor skills.  She reported that K.V. can feed herself, but needs help dressing herself.  Dent reported to Dr. Morton that,

> Socially she tends to be a loner.   She will cry behind a tree saying the children do not play with her.  Sometimes she will seek out the children. . . .  The teacher reported that she plays with children but her mother has not seen this.  She tends to play better with younger children.

R. 270.  Dent also reported that K.V. may miss facial expressions of others, has problems with changes in routine, overacts at least once a week, and does not play with toys at all much.  R. 270.

Dr. Morton examined K.V. and diagnosed ADHD and learning disabilities.  He found K.V., at age 6 years, had the social age of 17

months; the self help age of 2 years 8 months; the gross motor age of 3 years 9 months; the fine motor age of 4 years 2 months; the expressive language age of 2 years 7 months; the language comprehension age of 2 years 11 months; the letters age of 2 years 7 months; the number age of 2 years 11 months; and the general development age of 2 years 9 months. R. 273.

On August 27, 2009, the speech and language therapist at K.V.'s school opined that K.V.'s speech was 80% intelligible to the familiar listener, 70% intelligible to an unfamiliar listener; and 80% intelligible after repetition of the statement. R. 372. The therapist opined that K.V. had the most problems with receptive language and expressive language, but fewer problems with pragmatic language. R. 372-73. K.V. was receiving speech and language therapy 75 minutes per week in three 25-minutes sessions per week. The therapist evaluated K.V.'s progress as fair and K.V.'s development as atypical. R. 374.

On or about September 1, 2009, K.V.'s special education teacher Susie O'Quinn and her school social worker Lora Frisbie completed Teacher Questionnaire. O'Quinn stated that she had taught K.V. every school day for six hours a day for one year. O'Quinn and Frisbie opined that K.V. was at an early kindergarten reading level. O'Quinn and Frisbie

used an evaluation form that used a scale from 1 to 5:  1 was no problem, 2 was a slight problem, 3 was an obvious problem, 4 was a serious problem, and 5 was a very serious problem.  Using this scale, O'Quinn and Frisbie opined that K.V. had obvious or serious problems in seven of ten categories of acquiring and using information.  They opined that K.V. had a slight problem in twelve of thirteen categories of attending and completing tasks.  They opined that K.V. had an obvious problem in the thirteenth category of carrying out multi-step instructions.  They opined that K.V. had no problem in seven of thirteen categories of interacting and relating with others, and a slight problem in the remaining six categories.  They opined that K.V. had no problem moving about and manipulating objects or caring for herself.  R. 181-85.

On or about October 1, 2009, agency physician Dr. Sandra Bilinsky, M.D., psychologist, Dr. Leslie Fyans, Ph.D., and Nikki Arends, SLP, prepared a Childhood Disability Evaluation Form.[3]  R. 376-81.  They opined that K.V.'s impairments or combination of impairments did not meet, medically equal, or functionally equal any Listing of Impairments set forth in the Social Security regulations, 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listings).  R. 376.  They opined that K.V. had marked limitations in

---

[3] Dr. Bilinsky signed the form on October 1, 2009; Dr. Fyans signed the form on September 30, 2009, and Arends signed the form on September 23, 2009. All signed electronically.  The parties have not identified any indication in the record to explain the significance of the designation "SLP."

acquiring and using information; less than marked limitations in attending and completing tasks, interacting and relating with others, and health and physical well-being; and no limitations in moving about and manipulating objects, and caring for herself.  R. 378-79.

On October 7, 2009, K.V. saw Dr. Richard O'Halloran, M.D., for continued problems enuresis, wetting the bed.  He noted that an ultrasound showed normal upper tracts and that the images of the bladder were unremarkable.  Dr. O'Halloran scheduled a cystourethrogram.  R. 387.

On November 9, 2009, Dr. Ronald G. St. Hill, M.D., conducted a psychiatric evaluation of K.V.  Dent reported to Dr. St. Hill that when K.V. was 2 or 3 years old, K.V. did not use language appropriately.  Dent reported that her speech improved remarkably when she received speech therapy in preschool.  In preschool, K.V. had significant difficulty grasping and retaining information and concepts.  Dent also reported that K.V. had short term memory problems.  A developmental pediatrician diagnosed K.V. with ADHD and oppositional defiant disorder (ODD).  The developmental pediatrician prescribed Focalin XR for these conditions. R. 393.  The Focalin did not improve symptoms and caused problems with K.V.'s sleep.  R. 394.

Dent reported that K.V. was generally in a good mood and pleasant. She reported that K.V. was easygoing and easy to get along with. She reported that K.V. had tantrums no more than once or twice a week and that they lasted for 10 minutes or less. R. 393. Dent reported that K.V. did not engage her peers often, and when she did, she complained that they are mean to her and say mean things to her. R. 394.

On examination, Dr. St. Hill found that K.V. was alert, calm, cooperative, pleasant, and friendly. She sometimes could not respond to questions, but sometimes could maintain and engage in rapport. She maintained appropriate eye contact. She was able to sit and engage in a task for an appropriate period of time despite distractions. She was able to maintain appropriate focus. Her speech was normal in rate and volume, but had some dysarthria. She could not recall facts or data. Dr. St. Hill found no evidence of thought disorder. He found impaired recall and very limited insight and judgment. He diagnosed a learning disorder and cognitive disorder. He also noted "Rule out attention deficit hyperactivity disorder, predominantly inattentive type." R. 396. He found no evidence of ODD. He assigned a Global Assessment of Functioning (GAF) score of 50. R. 395-96. After this evaluation, K.V. stopped taking the Focalin. R. 404.

On November 25, 2009, K.V. saw Dr. O'Halloran again for enuresis.
Dent reported to Dr. O'Halloran that it was determined that K.V. did not
have ADHD.  She reported that K.V. wet the bed most nights and was not
on any medication.  She said the K.V. was wearing pull-ups.
Dr. O'Halloran told K.V.'s mother to stop the use of pull-ups and to stop
fluids at 7:00 p.m. and to wake K.V. twice during the night to use the
bathroom. He also wrote a note to school to state that K.V. was not allowed
to have chocolate milk.  R. 388.

On January 4, 2010, K.V. saw Dr. Kimberly, Twyman, M.D., at the
Cardinal Glennon Children's Medical Center in St. Louis, Missouri.  R. 404-
07.[4]  Dr. Twyman noted, "Mom has no concerns about her behavior at this
time but continues to have concerns about her learning difficulties at
school."  R. 404.  Dent also had concerns about K.V.'s social interaction
with other children.  K.V. preferred to play with younger children or by
herself.  R. 404.  K.V. reported that she enjoyed playing with other children
but sometimes the children can be mean to her.  She also reported that
K.V. enjoyed participating in the Big Brothers/Big Sisters program.  R. 405.

On examination, K.V. demonstrated good eye contact and attention.
Dr. Twyman found no evidence of inattention or hyperactivity during

---

[4] The first page of the report incorrectly states the date of the examination as April 4, 2010.  The correct
date is given on the last page of the report.

intelligence testing; however, K.V. became more impulsive and seemed to give up easily as the testing got harder.  R. 406.

Dr. Twyman's testing results showed K.V.'s "scores for inattention, hyperactivity, executive functioning and aggression were all below the clinically significant range."  R. 406.  Dr. Twyman further found that, "Clinically significant scores were noted for learning problems and peer relations."  R. 406.  Dr. Twyman diagnosed delayed I.Q., learning disabilities, and language disorder with articulation disorder.  Dr. Twyman noted that K.V. was making progress in speech therapy.  R. 406. Dr. Twyman concurred with the decision to stop the ADHD medication. R. 406-07.

On January 27, 2010, K.V. saw Dr. O'Halloran for enuresis.  On examination, Dr. O'Halloran noted good mobility and "Psychologic is generally satisfied with their life."  R. 425.  Dr. O'Halloran prescribed DDAVP for enuresis.  R. 425.

On March 3, 2010, K.V. saw Dr. O'Halloran for a follow up.  After K.V. started using the DDAVP, she only had three "accidents."  R. 426.  He continued the DDAVP and set a follow-up appointment in two months. R. 427.

On or about April 1, 2010, Dr. Raymond Castaldo, M.D., psychologist Dr. Donald Henson, Ph.D., and Michelle Curran, SLP, prepared another Childhood Disability Evaluation Form.  R. 418-23.[5]  They opined that K.V.'s impairments or combination of impairments did not meet, medically equal, or functionally equal any Listing.  R. 418.  They opined that K.V. had marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks, interacting and relating with others, and health and physical well-being; and no limitations in moving and manipulating objects and caring for herself.  R. 420-21.

On May 6, 2010, K.V. saw Dr. O'Halloran again.  K.V. continued to have only a few accidents while on the DDAVP.  Dr. O'Halloran continued the medication, but instructed K.V.'s mother to give the medication every second night beginning in June 2010.  R. 427.

On December 13, 2010, the Quincy School District prepared a report on K.V.'s progress on her annual goals in her Individual Education Plan (IEP).  The author of the report is unidentified and the report is unsigned. The report showed that K.V. was making progress on her goals, but had not met most of her goals.  R. 495-97.

---

[5] Dr. Castaldo signed the form on April 8, 2010, Dr. Henson signed the form on March 26, 2010, and Curran signed the form on March 14, 2010.  All signed electronically.

An undated note from K.V.'s special education teacher Michelle

Grawe stated, in part,

> [K.V.] is making progress in all of her IEP goals.  However, she
> still requires teacher redirection throughout the day back to
> tasks.  To complete an assignment correctly [K.V.] needs direct
> teacher instruction and most of the time becomes frustrated.
> [K.V.] is still struggling with her short term memory and has
> difficulty retaining information.

R. 494. The note appears to be appended to the December 13, 2010

report.[6]

On March 17, 2011, Grawe prepared a form regarding K.V.  R. 504-

07.  Grawe stated that K.V. struggled with short term memory.  Grawe

reported that K.V. had no medical problems and that her functional skills

were age appropriate.  Grawe stated that K.V. needed extra help

academically.  K.V. spent 40 % of her time in special education classes and

the rest in regular classes.  Grawe stated, "[K.V.] needs a lot of teacher

direction to complete tasks.  I might have to remind her to keep working or

give her step by step directions, depending on the task."  R. 506.  Grawe

stated that K.V. had no trouble relating or connecting with others, no

trouble moving about or manipulating objects, and no trouble caring for

---

[6] The Plaintiff states that the note is part of a March 3, 2011, attendance report in the record at R.493. The Court concludes that the note is part of the December 13, 2010, progress report.  The note appears on a separate piece of paper and is undated.  The note appears in the record between a March 3, 2011 attendance report and the December 13, 2010, progress report.  Some of the information in the note also appears in the December 13, 2010, report. The Court, therefore, concludes the note is part of the report.

herself.  R. 506.  Grawe stated that K.V. was in the second grade, but her academic skills were still in the kindergarten level.  R. 507.

On April 11, 2011, Grawe prepared a conference summary report regarding K.V.  R. 521-40.  The report set forth the goals for K.V. at school. The report also noted recent test results for language development.  K.V.'s scores were generally rated to be below average or poor.  R. 539.   K.V.'s progress reports showed that she continued to make progress toward her goals, but was not meeting most of them.  R. 509-11, 513-15, 525-40.

On April 12, 2011, the Administrative Law Judge (ALJ) conducted an evidentiary hearing in Hannibal, Missouri.  K.V. appeared with her mother and her attorney.  The ALJ discussed the record with K.V.'s attorney. During the conversation, K.V.'s mother stated that K.V. was scheduled to get a new IEP the next Thursday.  The ALJ kept the record open for thirty days to allow K.V. to submit the new IEP and any other additional materials.  R. 62.  Dent forwarded the April 11, 2011, conference summary report to the ALJ after the hearing.  R. 521-40.

The ALJ then spoke to K.V.  He asked her if she ever told a fib or a story that was not true.  K.V. answered no.  The ALJ asked K.V. if her mother taught her the difference between telling lies and telling the truth. K.V. answered no.  The ALJ then had K.V. sworn without objection.  R. 62.

K.V. testified that she was 8 years old, but she could not remember her birthday. She testified that she had two brothers and a sister, and they all lived with her mother. She also testified that they had a new baby brother. R. 62-63. She testified that she was in the third grade. She had three teachers. She stayed in the same class all day. She named five classmates, but stated that there were four kids in the class, including her. R. 63-64.

The ALJ asked K.V. whether she had a favorite subject. K.V. responded that "Mrs. Frost, my favorite." R. 65. He asked if she had subjects she did not like. She responded, "Some of my first homeroom, just one of them." R. 65. The ALJ asked K.V. if she brought homework home. K.V. responded, "Every year sometimes." R. 66. He then asked her if she brought homework home every night. She responded, "Sometimes." R. 66.

The ALJ asked K.V. whether her mother made her do any chores. K.V. responded, "No, he's little." K.V. stated that she thought the ALJ said "brothers" instead of "mother." R. 66. The ALJ repeated his questions and K.V. responded, "My mom asks me to put my bike up and I did." R. 66. K.V. testified that she played with her toys in her free time. R. 66. K.V. also said that she liked to watch television. R. 66.

Dent then testified.  Dent testified that she had five children.  She described herself as an at-home mother.  She was separated from her husband.  She testified that K.V. got along with her siblings "for the most part normal."  R. 67. Dent testified that K.V. was not taking any medications.  R. 67.

Dent testified that K.V. was in a special education class for learning disabled children.  She testified that there were seven or eight children in the class.  R. 69.  The class had a teacher and two or three aids.  R. 81-82.  Dent testified that K.V. attended some regular classes for non-academic subjects such as music.  R. 68-69.  K.V. got speech therapy two to three times a week at school.  R. 80.

Dent testified that K.V. had a low IQ and had difficulty learning at school.  She testified that K.V. could not do many of the things her six year old younger sister could do, such as tie her shoes and bathe herself.  Her mother testified, "I have to oversee pretty much everything she does.  She's a bed wetter."  R. 69.  K.V.'s mother testified that she must watch K.V. bathe to make sure K.V. washed herself.  K.V.'s mother still washed K.V.'s hair.  R. 69.

Dent testified that K.V. did not have good social skills.  Most of K.V's friends in the neighborhood were a couple of years younger than K.V.

R. 69-70.  K.V. did not participate in any organized sports, clubs or social organizations.  R. 70.

Dent testified that K.V. had in the past taken medication for ADHD and for enuresis.  The ADHD medication was stopped because it was interrupting her sleep and school officials did not see any problems with hyperactivity.  R. 70.  The enuresis medicine was stopped because the doctor did not want K.V. to become dependent on it.  R. 71.

The ALJ asked Dent to describe a typical day.  She testified that she first washes the urine off K.V. when K.V. gets up.  Dent helps K.V. get dressed, brush her hair, brush her teeth, and get ready for school.  R. 72. Dent helps her dress by picking out K.V.'s clothes.  Dent must also button K.V.'s pants and tie her shoes.  K.V. can work zippers. R. 79.  The bus then picks K.V. up for school.  Her mother testified that K.V. lived two to three blocks from school, but took the bus because K.V. would get lost trying to walk to school.  R. 72.  After school, K.V. has a snack and does her homework with her mother.  Dent said doing homework is "Like pulling nails. R. 73.  K.V. argues with Dent about homework every day.  K.V.'s mother estimated that homework takes over an hour.  R. 73.  After finishing homework, K.V. watches television or rides her bike.  K.V. does not play with the other children her own age in the neighborhood.  She tells her

mother that they are mean to her and say mean things to her.  They say she is stupid, ignorant, and dumb.  She plays with younger children in the neighborhood.  R. 74.

Dent testified that K.V. must pick up after herself.  She testified that K.V. does not like doing chores.  She testified, though, that K.V. usually will get her own room clean.  R. 74-75.  Dent also testified that K.V. has told lies in the past.

Dent testified that K.V. was in the second grade, but went with the regular first graders for non-academic subjects such as music and gym. Dent testified that the school keeps K.V. with the younger children because K.V. developed a connection with the teacher of those children while K.V. was in kindergarten.  That teacher is now teaching first grade.  In addition, K.V.'s younger sister is in the class.  R. 75.

Dent testified that K.V. cannot go outside alone because she might wander off.  Dent testified that K.V. wandered off several times.  In each case, they found K.V. in some other part of their housing complex.  Once K.V. was trying to go to a friend's house, but when they found her, she was not anywhere near the friend's house and was going away from the friend's house.  R. 76-77.

Dent testified that she worries about K.V. going off with strangers. R. 78.  Dent also testified that K.V. does not look both ways before crossing the street and sometimes rides her bike out in the road.  R. 80.

Dent testified that K.V. cannot remember or follow more than one instruction at a time.  Dent opined that K.V.'s ability to take care of herself was below a normal 5 year old.  R. 78.

The ALJ concluded the hearing, but kept the record open for thirty days.  In addition to the April 11, 2011, conference report, K.V. submitted records showing that on May 9, 2011, K.V. saw Dr. Baustain for several problems including enuresis.  K.V.'s mother asked for medication for enuresis.  She said that another doctor stopped the medication, and that K.V. was wetting the bed every night.  R. 262.  Dr. Baustain again prescribed DDAVP spray for enuresis.  R. 263.

<u>THE DECISION OF THE ALJ</u>

On July 28, 2011, the ALJ issued his decision.  R. 41-52.  The ALJ followed the three step process for determining disability of minors under the Commission's regulations (Analysis).  In Step 1, the ALJ must determine that the minor is not engaged in substantial gainful activity. 20 C.F.R. §§ 416.924(b) and 416.972(a).  If so, the ALJ must determine at Step 2 that the minor suffers from a severe impairment of combination of

impairments that are severe.  20 C.F.R. § 416.924(c).  If so, at Step 3, the ALJ must determine whether the severe impairments: (a) medically equal a Listing; or (b) functionally equal a Listing; and that the level of impairment has lasted or is expected to last for at least twelve months.  20 C.F.R. § 416.924(d).  If so, then the minor is disabled.

To determine at Step 3 whether a minor's impairments are functionally equivalent to a Listing, the ALJ must consider the minor's level of functional impairment in six domains:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) health and physical well-being.  To be functionally equal to a Listing, the minor's functioning must be markedly limited in two of the six domains or extremely limited in one of the domain.  20 C.F.R. § 416.926a(d).

Section 416.926a(e) of the Commissioner's regulations define "marked" and "extreme" limitations.  20 C.F.R. § 416.926a(e).  Section 416.926a(e) states, in part:

(e) How we define "marked" and "extreme" limitations—

(1) General.

(i) When we decide whether you have a "marked" or an "extreme" limitation, we will consider your functional limitations

resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

(ii) The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

(2) Marked limitation.

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

. . . .

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in

domain-related activities is consistent with that score. (See paragraph (e)(4) of this section.)

. . . .

(3) Extreme limitation.

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

. . . .

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (See paragraph (e)(4) of this section.)

(4) How we will consider your test scores.

(i) As indicated in § 416.924a(a)(1)(ii), we will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a "marked" or an "extreme" limitation in a domain.

(ii) We will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others.

> (A) We may find that you have a "marked" or "extreme" limitation when you have a test score that is slightly higher than the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is seriously or very seriously limited because of your impairment(s). For example, you may have IQ scores above the level in paragraph (e)(2), but other evidence shows that your impairment(s) causes you to function in school, home, and the community far below your expected level of functioning based on this score.

. . . .

20 C.F.R. § 416.926a(e).[7]

In making these determinations about functional limitations, the ALJ

must also evaluate the "whole child:"

> This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings. We have long called this technique our "whole child" approach.

SSR 09-1p.

---

[7] The regulations use a different test for determining marked and extreme limitations in the sixth domain of health and well-being.  20 C.F.R. §§ 926a(e)(2)(iv) & (e)(3)(iv).  These provisions of regulations generally require frequent illnesses that cause a defined level of functional impairments.  Dent does not challenge the ALJ's determinations regarding this domain.  See Dent Motion, at 4.

The ALJ determined that K.V.'s condition met the requirements of Steps 1 and 2 of the Analysis.  She was not engaged in substantial gainful activity and she suffered from the severe impairments of speech and language delays, learning disorder, ADHD, rare syncopal episodes, and episodic enuresis.  R. 44.

At Step 3, the ALJ stated that he considered the whole child.  The ALJ considered how K.V. functioned in all settings and at all times, as compared to other children of the same age who do not have impairments.  The ALJ also stated that he considered the interactive and cumulative effect of all of K.V.'s impairments in all of the domains.  The ALJ stated that he also considered the type, extent, and frequency of help K.V. needs to function.  R. 44-45.

The ALJ then summarized the testimony of K.V. and Dent at the hearing.  R. 45-46.  The ALJ found Dent to be credible.  The ALJ also considered the other evidence in the record, including the opinions of Drs. Bilinsky, Fyans, Castaldo, and Henson, and health care professionals Arends and Curran set forth on the two Child Disability Evaluation Forms.  The ALJ put considerable weight on the opinions set forth on those forms.  The ALJ noted that, "No treating or examining source indicated more severe restrictions that those found by the state agency sources."  R. 46.

The ALJ then addressed the six domains for determining functional equivalence with a Listing. The ALJ found that K.V. had marked limitations in acquiring and using information, but less than marked limitations in attending and completing tasks, interacting and relating to others, caring for herself; and health and physical well-being. The ALJ found no limitations in moving about and manipulating objects. R. 47-52. Dent does not challenge the ALJ's findings regarding the domains of acquiring and using information, moving about and manipulating objects, and health and physical well-being. The Court does not address these portions of the ALJ's decision further.

With respect to attending and completing tasks, the ALJ relied on the Child Disability Evaluation Forms and the evaluation by O'Quinn and Frisbie. The ALJ also relied on the evidence indicating that K.V. had no need for ADHD medication. R. 48-49. With respect to interacting with others, the ALJ relied on the Child Disability Evaluation Forms, the evidence record that K.V. gets along with others at school and has not been placed in special education for problems with relating to others. The ALJ also noted that K.V. got along with her siblings and had friends. He also relied on observations of K.V. at the hearing. R. 49.

With respect to caring for herself, the ALJ relied on lack of any medical evidence or evidence from school records indicating a problem with caring for herself.  The ALJ credited Dent's testimony about having to help K.V. extensively to care for herself and having to watch K.V. closely while outside, but concluded that overall the evidence indicates a limitation in this domain that was less than marked.  R. 51.

The ALJ concluded that K.V. was markedly limited in only one domain and was not disabled.  R. 52.

Dent and K.V. appealed the decision.  The Appeals Council denied her request for review on February 17, 2012.  The ALJ's decision then became the decision of the Commissioner.  R. 1.  Dent then brought this action on behalf of K.V. for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782
F.2d 79, 82 (7th Cir. 1986).  The ALJ must articulate at least minimally his
analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333
(7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the
evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872
(7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  K.V.'s
condition did not medially equal any Listing.  Dent does not dispute this
finding.  <u>See</u> <u>Dent Motion</u>, at 4.  The issue before the ALJ, thus, was
functional equivalence.  Dent argues that the ALJ erred in his findings in
the domains of attending and completing tasks, interacting and relating with
others, and caring for herself.  <u>Id.</u>  Dent presents no evidence, and makes
no argument, that any of K.V.'s relevant test results were more than two
standard deviations below the norm.  The ALJ, thus, had to determine
whether, "other information in [K.V.'s] case record shows that [K.V.'s]
functioning in day-to-day activities is seriously or very seriously limited
because of [her] impairment(s)."  20 C.F.R. § 416(e)(4)(ii)(A).  Based on the
regulatory criteria, substantial evidence supports the ALJ's decision that
K.V. was less than markedly impaired in the domains of attending and

completing tasks, interacting and relating with others, and caring for herself.

With respect to attending and completing tasks, O'Quinn and Frisbie opined that K.V. had only a slight problem in 12 of 13 categories of attending and completing tasks. Dr. St. Hill found that K.V. was able to sit and engage in a task for an appropriate period of time despite distractions. Dr. Twyman found that K.V.'s test scores for inattention and hyperactivity were "below the clinically significant range." R. 406. The agency doctors and other professionals who prepared both Childhood Disability Evaluation Forms opined that K.V.'s limitations were less than marked in this domain. The ALJ acknowledged that Grawe noted that K.V. required redirection by the teacher to stay on task. Dent also testified that she had to struggle with her daughter daily to complete homework. The ALJ, however, when considering all the evidence, concluded that K.V. had a limitation in this domain, but the limitation was less than marked. This Court will not reweigh this conflicting evidence or substitute its judgment for that of the ALJ. See Delgado, 782 F.2d at 82. The evidence from O'Quinn and Frisbie, Dr. St. Hill, and the Childhood Disability Evaluation Forms provide substantial evidence to support the ALJ's ultimate conclusion.

With respect to interacting and relating to others, O'Quinn and Frisbie opined that K.V. had no problem or only a slight problem in this area. Grawe opined that K.V. had no problem relating or connecting with others. Dr. St. Hill found that K.V. was sometimes able to engage in rapport with him. Both Childhood Disability Evaluation Forms contained opinions that K.V.'s limitations were less than marked in this domain. Dent testified that K.V. did not like playing with children her own age because they were mean to her, but played with younger children. Dent further testified K.V. had a normal relationship with her siblings for the most part. R. 67. Dent told Dr. Twyman that K.V. liked participating in the Big Brothers/Big Sisters program. The ALJ found that K.V. could relate to him appropriately at the hearing, although he acknowledged that K.V. gave some non-responsive answers to "2 or 3 questions (a small proportion of the questions asked)". R. 49. Taken as a whole, this evidence supports the ALJ's findings.

With respect to caring for herself, O'Quinn, Frisbie, and Gawe all opined that K.V. had no problems caring for herself. The agency doctors and other professionals who prepared both Childhood Disability Evaluation Forms opined that K.V. had no limitations caring for herself. Dent on the other hand, testified that K.V. needed significant help caring for herself. The ALJ considered all of this conflicting evidence and determined that

K.V. had limitations in caring for herself, but the limitations were less than marked.  This Court will not reweigh the evidence.  The opinions of O'Quinn, Frisbie, Gawe and the agency professionals provide substantial evidence for the ALJ's finding in this domain.

Dent repeatedly urges the Court to reweigh the evidence.  The Court will not do so.  Dent also notes that the ALJ erred in stating that K.V. was meeting her goals in the IEP.  <u>See</u> R. 48.  The ALJ erred in making this statement.  The ALJ, however, also correctly stated that K.V. was making progress toward her goals rather than meeting her goals.  <u>See</u> R. 46.  Any error was harmless.  The ALJ fully explained the basis of the opinion and the inaccurate statement about meeting goals did not affect the outcome.

Dent argues that the ALJ failed to consider the "whole child" in his analysis.  Dent cites the detailed lists of factors that are to be considered in making this whole child analysis and argues that the ALJ failed to consider these factors or conduct this analysis.  <u>See</u> <u>Dent Motion</u>, at 13-15; SSR 09-1p.  The Court has carefully considered the matter and concludes that the ALJ provided a sufficient whole child analysis.  The ALJ clearly stated that he considered the whole child and the effects of all impairments on the various domains.  R. 44-45.  Furthermore, the ALJ is not required to discuss in detail all of the "whole child" factors listed in SSR 09-1p.  Rather,

the ALJ must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings."  SSR 09-1p, at 3.

The ALJ provided sufficient detail to enable the Court to understand how he made his ruling.  The ALJ was presented with evidence of a child, K.V., with a severe learning disability and speech delays.  The ALJ was also presented with an initial assessment by Dr. Morton that K.V. had ADHD, and subsequent assessments by Drs. St. Hill and Twyman calling the ADHD diagnosis into question.  Dent even reported to Dr. O'Halloran that it was determined that K.V. did not have ADHD.  Finally, the ALJ had evidence of enuresis.  The ALJ considered the impact of all these impairments on K.V.'s functional domains.  In making this analysis, the ALJ was presented with conflicting evidence in each of the three domains at issue, attending and completing tasks, interacting and relating with others, and caring for herself.  The ALJ considered the evidence and made findings.  The ALJ found a limitation in each domain, but a limitation that was less than marked.  The ALJ sufficiently explained the basis of his ruling to allow the Court to understand how he reached his ruling.  The ALJ properly considered the whole child.  As explained above, the Court will not reweigh the evidence or substitute its judgment for that of the ALJ.  See Delgado, 782 F.2d at 82.

Dent last argues that the ALJ failed to take into account the extensive help that K.V. received to get through the school day and be as independent as she appears next to her peers.  The Court disagrees.  The ALJ specifically considered the opinions of Dent's special education teachers O'Quinn and Gawe in determining her limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for herself.  O'Quinn and Gawe disagreed on the degree of K.V.'s ability to attend and complete tasks; the ALJ resolved that disagreement by finding that K.V. was limited in this domain, but the limitation was less than marked.  The Court will not reweigh the ALJ's evaluation of that evidence.  O'Quinn and Gawe largely agreed that K.V. had few or no problems in the domains of interacting and relating with others, and caring for herself.  The ALJ, thus, considered the opinions of those most directly involved in the degree of help that K.V. received at school.  The Court sees no error in the ALJ's consideration of the help K.V. received at school.

WHEREFORE Defendant Acting Commissioner of Social Security's Motion for Summary Affirmance (d/e12) is ALLOWED, and Plaintiff Dent's Brief in Support of Motion for Summary Judgment (d/e 8) is DENIED.  The

decision of the Acting Commissioner is AFFIRMED.  All pending motions
are denied as moot.  THIS CASE IS CLOSED.


ENTER:    April 9, 2013


                                              *s/ Byron G. Cudmore*
                                       UNITED STATES MAGISTRATE JUDGE